UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF SAMSUNG GALAXY8, SM-G950U, IMEI 357723081243962, LOCATED AT THE FBI WASHINGTON FIELD OFFICE | Misc. No. _____ |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Jenny M. Cutalo-Patterson, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, a digital device, which is currently in law enforcement possession, and the extraction from that property of electronically stored information as described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since October 2005, and am currently assigned to the Washington Field Office, Northern Virginia Resident Agency (NVRA).  Since joining the FBI, I have investigated violations of federal law involving Counterintelligence matters and currently investigate federal violations concerning child pornography and the sexual exploitation of children.  I have gained experience in conducting such investigations, through formal classroom training, and on-the-job training. Your affiant has been involved in investigations involving the exploitation of children, including offenses involving the dissemination of child pornography on the Internet via computer.

3.      As a federal agent, I am authorized to investigate violations of laws of the United

States, and as a law enforcement officer I am authorized to execute warrants issued under the

authority of the United States.

4.      This affidavit is intended to show only that there is sufficient probable cause for

the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.      The property to be searched is a Samsung Galaxy 8, SM-G950U, IMEI

357723081243962, hereinafter the "DEVICE."

6.      The DEVICE is currently located at the FBI Washington Field Office at 601 4th

Street, N.W., Washington, D.C.

## PROBABLE CAUSE

7.      Leading up to Thursday, December 14, 2017, an FBI task force officer, was

acting in an undercover capacity as part of the Metropolitan Police Department-Federal Bureau

of Investigation ("MPD-FBI") Child Exploitation Task Force. The UC had posted numerous

online bulletin messages on specific social media forums, which, based on the UC's experience

and information gathered from other sources, are websites that are frequented by individuals who

have a sexual interest in children and incest. The bulletin messages were intended to attract

individuals with a sexual interest in children. The UC would respond to certain messages or post

messages on these public forums and provided his Kik account screen name. "Kik" refers to Kik

messenger, a free mobile application that permits users to send text messages and other content,

including videos and images.

8.      On Thursday, December 14, 2017, at approximately 2:17pm EST an individual using the Kik screen name, "treeman2832," subsequently identified as the defendant, Jeremy Sears sent the UC a private message via Kik instant messenger stating, "Hey." During the course of the chat, Sears stated that he was a married father with a 10-year-old daughter residing in the Boston area.

9.      The UC informed Sears that he was the father of an 8-year-old daughter. Sears requested images of the UC's purported daughter and asked him if he wanted to trade pictures. Sears stated that he has taken nude photos of his daughter in the past, but deletes them from his phone. Sears stated that he has not sexually abused his daughter.

10.      During the course of the chat, Sears sent the UC five images of his purported daughter. All of the images appear to be the same girl, and she is clothed in all of the images. Sears requested the UC to take pictures of his purported daughter's vagina. Sears informed the UC that he would take nude images of his daughter later in the evening and send them to the UC. The UC asked Sears what size panties his daughter wore, to which Sears quickly responded back, "9." Sears then sent the UC an image depicting two pairs of children's underwear lying on a bed.

11.      As the chat continued, Sears asked, "U like young girl vids?" Shortly after asking, Sears sent the UC a video depicting child pornography. Specifically, the video depicted an adult male inserting his penis in the child's anus, while inserting his finger inside the child's vagina. Sears then sent the UC a Dropbox link containing 102 videos. The vast majority of the videos depict female children under the age of approximately ten being sexually assaulted by adult men and women. The sexual acts depicted in the videos include vaginal and anal penetration of the

minors depicted. Sears ended the chat session stating, "My wife got home I will txt u in a little and send nudes of my daughter."

12.     On Friday December 15, 2017, Sears again contacted the UC and began another chat session.  During the course of the chat, Sears sent the UC two additional links containing numerous videos depicting what appeared to be teenage and prepubescent minors engaged in sexual acts. Sears stated that he has additional child pornography that he trades with other people. He further indicated that he had not taken pictures of his daughter the prior evening because his wife was present, but stated that he intended on taking pictures of her that evening.

13.     On Monday December 17, 2017, the UC continued to chat with Sears via Kik. During the course of the chat, Sears provided the UC with his cellular phone number, which he indicated was 702- 522-0611. The UC then had a brief conversation with Sears via text messaging at the telephone number provided before resuming a chat conversation via Kik. During the course of the chat, Sears asked the UC if he had taken any pictures of his daughter. The UC sent Sears an image of his purported daughter, depicting the purported child wearing a pink shirt and underwear. The image did not depict a real child.  Sears responded, "Sexy any nude ones?" The UC asked Sears about Sears' sexual activity with his daughter, "what's the most you have done?" Sears responded, "Just look touch her boob and butt."

14.     On December 19, 2017, Sears sent the UC two Dropbox links, titled, "X" and "dirty vids." Dropbox link "X" was a duplicate of the link that Sears sent on December 14, 2017. The file titled, "dirty vids" contained 116 videos depicting mostly what appeared to be adult and older teens engaging in sexual activity. The UC sent Sears an image of his purported daughter depicting the UC holding a note near the child with the date, "12/19/17" written on a piece of

paper. Sears sent the UC two additional Dropbox links titled, "Kleine Kinder" and "V1." Both of those Dropbox links contain numerous videos depicting mostly what appeared to be older teens engaged in sexual acts.

15.     That same day, Sears also sent the UC five videos depicting prepubescent children being sexually abused by adult men and woman. The following are descriptions of the videos Sears sent:

    a.   A video depicting a prepubescent female masturbating an adult male penis in a bathtub;

    b.   A video depicting an adult female licking a prepubescent female child's vagina while inserting a sex toy in the child's anus;

    c.   A video depicting an adult male licking a prepubescent child's vagina and anus and rubbing his penis on her bare vagina and anus;

    d.   A video depicting an adult female licking a prepubescent child's vagina and inserting her finger in the child's vagina; and

    e.   A video of a prepubescent female sucking an adult male penis.

16.     Sears also sent the UC fifteen images the same day depicting child pornography. The majority of the images depict prepubescent children engaged in sexual acts. The following are examples of the images Sears sent:

    a.   An image of a prepubescent female child sucking an adult male penis;

    b.   An image of a prepubescent female child naked from the waist down, spreading her legs apart to expose her vagina; and

    c.  An image depicting a prepubescent female child being anally penetrated by an adult male penis.

17.    On December 21, 2017, Sears sent four images of his daughter. The images depicted a young girl in a bedroom wearing underwear and a shirt. The child does not appear to be aware that her picture is being taken. Sears also sent an additional eleven images depicting a child who appeared to be between the ages of ten and twelve. The child was clothed, and in a laundry room. The majority of the pictures focused on the child's buttocks as she was bending over. The top of the child's buttock crack was visible in some of these images.[1] Sears stated, "I love to fuck my buddies daughter," referring to the girl in the pictures.

18.    On December 22, 2017, Sears sent the UC three additional Dropbox links.  Two of the links, titled "X" and "Kleine Kinder" were duplicates of links that Sears had previously sent the UC, as set forth above. The third link was entitled "V9," and contained 31 videos depicting mostly young teen and older teen girls either engaged in sexual activity or suggestively posing.

19.    On December 26, 2017, Sears sent the UC via Kik messenger two additional videos depicting child pornography. The first video is two minutes in length and depicts a prepubescent female being sexually abused by an adult male. The child sucks on the penis of the

---

[1] As a result of a technical difficulty with the UC's phone, the four clothed images of Sears' friend's daughter that Sears sent the UC were unable to be forensically extracted and retained.  As a result, the images as described are not available for production.  However, the descriptions noted herein were written contemporaneously by the UC upon receipt of the images and while the UC was observing the images directly.  None of the images depicted child pornography.

male, who is wearing a clown face mask to disguise his face and is digitally penetrating the child's vagina with his fingers.

20.     In December of 2017, the FBI served an emergency disclosure request on Kik requesting subscriber information and IP access logs associated with the account. Kik responded by providing information that the associated display name was "Jeremy Sears," and that the account was associated with an unconfirmed email address of treeman2832@yahoo.com. Kik also provided IP logs between November 15, 2017, and December 14, 2017, which indicated that the account holder primarily connected to his account via an AT&T Wireless telephone.

21.     The FBI then served an administrative subpoena on Yahoo for subscriber information associated with the email address "treeman2832@yahoo.com." Yahoo responded by providing a subscriber name of "Jeremy Sears" and a telephone number associated with the account of 508-762-6924.

22.     The FBI served an administrative subpoena on Nextplus, the owner of the phone number provided by Sears to the UC during the course of the chats, for subscriber information associated with telephone number 702-522-0611. Nextplus responded that the subscriber was "Jake Smith" linked to email address jeremysears2828@icloud.com.

23.     Upon receipt of all of this information, WFO used available open source and law enforcement sensitive databases to fully identify the user of Kik account "treeman2832" as Jeremy J Sears, with a date of birth of 06/28/1985; a social security number of 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; and an address of 92B Littlerest Road, Brimfield MA 01010.

24.     On June 22, 2018, United States Magistrate Judge for the District of Columbia, Judge Robin Meriweather signed a warrant for the arrest of Jeremy Sears for one count of

Distribution of Child Pornography pursuant to 18 U.S.C. § 2252(a)(2). Pursuant to this warrant, Sears was arrested on June 28, 2018, while driving a car near his residence in Brimfield, MA. The DEVICE was in plain view on the console of the vehicle Sears was driving and was seized by FBI Agents.

25.     Following his arrest, Sears was advised of his rights and waived them, agreeing to speak with the agents. During the interview, Sears admitted to sending and receiving child pornography images and videos and using Kik for approximately seven months prior to his arrest. Sears also admitted to using the DEVICE to view and send these images. Sears denied offering to show anyone naked photographs of his children.

26.     After seizing the DEVICE during the course of the arrest, the FBI agent in Massachusetts sent a package via FedEx to the undersigned containing the DEVICE. The undersigned entered the DEVICE into evidence at the FBI Washington Field Office.

## TECHNICAL TERMS

27.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high-speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with

such device.  *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that

perform information processing using a binary system to represent information.  Computers

include, but are not limited to, desktop and laptop computers, smartphones, tablets,

smartwatches, and binary data processing units used in the operation of other products like

automobiles.

2)     "Digital storage media," as used herein, means any information

storage device in which information is preserved in binary form and includes electrical, optical,

and magnetic digital storage devices.  Examples of digital storage media include, but are not

limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory

cards, and internal and external hard drives.

3)     "Computer hardware" means all equipment that can receive,

capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic,

or similar computer impulses or data.  Computer hardware includes any data-processing devices

(including, but not limited to, central processing units, internal and peripheral storage devices

such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory

storage devices); peripheral input/output devices (including, but not limited to, keyboards,

printers, video display monitors, modems, routers, scanners and related communications devices

such as cables and connections), as well as any devices, mechanisms, or parts that can be used to

restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.     "Wireless telephone" (or mobile telephone, or cellular telephone), a type

of digital device, is a handheld wireless device used for voice and data communication at least in

part through radio signals and also often through "Wi-Fi" networks.  When communicating via

radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

      c.  A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

e.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

f.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.     The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

h.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

28.     Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, and GPS navigation device.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense under investigation.

12

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

29.     As described above and in Attachment B, this application seeks permission to search for information that might be found within the DEVICE.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the DEVICE for at least the following reasons:

a.   Individuals who engage in criminal activity, including the knowing receipt or distribution of any visual depiction of a minor engaging in sexually explicit conduct that has been mailed or shipped or transported in interstate or foreign commerce and the knowing receipt or distribution of any child pornography - or any material that contains child pornography - that has been mailed or shipped or transported in interstate or foreign commerce by any means, including by computer in violation of Title 18 U.S.C. 2252 and 2252A, use wireless telephones, like the DEVICE, to access applications and cloud storage to facilitate illegal activity and to communicate with others online; and to store contact information of co-conspirators, including telephone numbers, email addresses, and/or identifiers for messaging and social medial applications or accounts. As stated previously, Sears communicated with others and the UC via Kik and had access to cloud storage.

b.    Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

13

c.    Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

30.    As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that

establishes how the digital device(s) were used, the purpose of their use, who used them (or did

not), and when.  Based on my knowledge, training, and experience, as well as information

related to me by agents and others involved in this investigation and in the forensic examination

of digital devices, I respectfully submit there is probable cause to believe that this forensic

electronic evidence and information will be in the DEVICE at issue here because:

        a.    Although some of the records called for by this warrant might be found in the

form of user-generated documents or records (such as word processing, picture, movie, or texting

files), digital devices can contain other forms of electronic evidence as well.  In particular,

records of how a digital device has been used, what it has been used for, who has used it, and

who has been responsible for creating or maintaining records, documents, programs,

applications, and materials contained on the digital device(s) are, as described further in the

attachments, called for by this warrant.  Those records will not always be found in digital data

that is neatly segregable from the hard drive, flash drive, memory card, or other electronic

storage media image as a whole.  Digital data stored in the DEVICE(s), not currently associated

with any file, can provide evidence of a file that was once on the storage medium but has since

been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted

from a word processing file).  Virtual memory paging systems can leave digital data on a hard

drive that show what tasks and processes on a digital device were recently used.  Web browsers,

e-mail programs, and chat programs often store configuration data on a hard drive, flash drive,

memory card, or memory chip that can reveal information such as online nicknames and

passwords.  Operating systems can record additional data, such as the attachment of peripherals,

the attachment of USB flash storage devices, and the times a computer, smart phone, or other

digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

   b.   Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

   c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

   d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how

the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.    Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

      f.    I know that when an individual uses a digital device to distribute child pornography, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

### METHODS TO BE USED TO SEARCH DIGITAL DEVICES

      31.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone

18

else to control the digital device remotely is not present on the digital device.  Evidence of the

absence of particular data or software on a digital device is not segregable from the digital device

itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or

software requires specialized tools and a controlled laboratory environment, and can require

substantial time.

        d.     Digital device users can attempt to conceal data within digital devices

through a number of methods, including the use of innocuous or misleading filenames and

extensions.  For example, files with the extension ".jpg" often are image files; however, a user

can easily change the extension to ".txt" to conceal the image and make it appear that the file

contains text.  Digital device users can also attempt to conceal data by using encryption, which

means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the

data into readable form.  Digital device users may encode communications or files, including

substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby

thwarting "keyword" search techniques and necessitating continuous modification of keyword

terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend

themselves to keyword searches.  Some applications for computers, smart phones, and other

digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-

text format.  Documents printed by a computer, even if the document was never saved to the

hard drive, are recoverable by forensic examiners but not discoverable by keyword searches

because the printed document is stored by the computer as a graphic image and not as text.  In

addition, digital device users can conceal data within another seemingly unrelated and innocuous

file in a process called "steganography."  For example, by using steganography a digital device

user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

e.     Analyzing the contents of mobile devices, including wireless telephones, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.    Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

g.    In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.    The digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel, sometimes with the aid of a technical expert, in an appropriate setting, in order to extract and seize the information, records, or evidence described in Attachment B.

2.    The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their

precise contents; "scanning" storage areas to discover and possibly recover recently deleted data;

scanning storage areas for deliberately hidden files; and performing electronic "keyword"

searches through all electronic storage areas to determine whether occurrences of language

contained in such storage areas exist that are related to the subject matter of the investigation.

       3.     In searching the digital devices, the forensic examiners may

examine as much of the contents of the devices as deemed necessary to make a determination as

to whether the contents fall within the items to be seized as set forth in Attachment B.  In

addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or

encrypted data to determine whether the contents fall within the items to be seized as described

in Attachment B.  Any search techniques or protocols used in searching the contents of the

digital devices will be specifically chosen to identify the specific items to be seized under this

warrant.

### AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

       32.    Because forensic examiners will be conducting their search of the digital devices

in a law enforcement setting over a potentially prolonged period of time, I respectfully submit

good cause has been shown, and therefore request authority, to conduct the search at any time of

the day or night.

## **CONCLUSION**

33.     I respectfully submit that this affidavit supports probable cause for a warrant to

seize and search the digital device described in Attachment A and to seize the items described in

Attachment B.


                                          Respectfully submitted,


                                          _____
                                          Jenny M. Cutalo-Patterson
                                          Special Agent
                                          Federal Bureau of Investigation


Subscribed and sworn to before me
on July 25, 2018:


_____
DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLUMBIA